All arguments not to exceed 15 minutes per side. Mr. Andrew C. Brandon for the appellate. Mr. Brandon. May it please the court, my name is Andrew Brandon. I've already requested three minutes for rebuttal to represent Alisha Glisson. Your Honors, Ms. Glisson was the least culpable of four individuals accused of murder. The three individuals who actually received 30 years, 20 years, and no years respectively. Alisha Glisson received a life sentence despite having not actually participated in the killing. But you're not here on a sentencing issue, are you? No, Your Honor, I'm not. There are three factors that make this case uniquely amenable to habeas corpus relief, which is what we're here for. The first factor is the Tennessee Court of Criminal Appeals erroneously analyzed this as a failure to call a witness case rather than a failure to investigate a witness case. The second factor is that because this is a failure to investigate a witness case, we don't defer to counsel's so-called strategic decision not to call that witness because counsel had no basis for that close case. Indeed, the trial court stated that the evidence was extremely thin. We do not, we have a lower quantum of proof for prejudice as the Supreme Court recognized in Strickland. I'll address the first point. I intend to start with addressing the ineffective assistance of counsel claim and I'll address sufficiency evidence if I have time. As far as the first point, this case is squarely in line with English v. Romanowski where because this is a decision of our court, of this court, where because the case, because the Tennessee Court of Criminal Appeals addressed this as a failure to call a witness claim rather than a failure to investigate a witness claim, we don't give deference to the state court. There was some reference to a minimal investigation in the fact section of the Tennessee Court of Criminal Appeals opinion, but that was not an analysis. It didn't show up in the court's analysis. And essentially the... Was it raised though? Yes, it was raised as a... Doesn't that famous case say that if it's raised and the court doesn't grant relief on it, we assume that it dealt with the merits and we still give that preference? I believe you're referencing Harrington v. Richter. That's right. Thank you. It's early in the morning. Harrington v. Richter. Why isn't that controlling? So you know what I'm thinking. This is a sort of controversial issue for us at least. Harrington v. Richter is a case about an unreasoned decision. And courts have on occasion applied it to a reasoned decision like this, but I would just... It isn't reasoning where it's totally independent in the end. And you could say if they reasoned this way, they wouldn't have to reach that, but they reasoned wrong this way or something like that. It's something that you raised or your party raised and they didn't grant you relief on it. Right. But most of their discussion you say dealt with another aspect of the issue. Well, exactly. And in Harrington... But all that says is under Harrington v. Richter is that they didn't tell you what they were thinking, but it doesn't matter. Well, we would submit that what they told us demonstrated that an objectively unreasonable analysis of the issue, which failed to look at the... Under Strickland, failed to look at the investigation. And I would just ask that... Harrington v. Richter itself dealt with an unreasoned opinion and our position is it does not apply to a reasoned opinion like that. And the reason for that is that to the extent that AEDPA is about deference to state courts, it's not deferential to say, well, if the state courts had just been smart like us, they would have said this. That's not deferential. That was pretty much what Harrington v. Richter said. Well, again, that was in the context of an entirely unreasoned portion of the state's decision. How's that different from this? Well, this, the state court... Partially reasoned. They took it on directly. They said, this is okay because of this reason. And they gave that reason and this court, I think, needs to first defer to that and then say why it's wrong. And it was wrong because they failed to analyze this as a... So we should look at it under AEDPA, then? No. We should look at it, we should say that under AEDPA, they were, their decision was contrary to law under D1 of 2254. It was contrary to the prevailing law because it failed to analyze this as what it is. And there are numerous courts, I mean, numerous decisions of this court published that say, you know, counsel could not have evaluated or weighed the risks and benefits of calling Richard as a defense witness without so much as asking Richard what he would say if called. That's Towns v. Smith. And these are cases that have assimilated Harrington v. Richter and understood that. And so the point is that AEDPA does not bar relief. We get past AEDPA, D1, and now we're looking at Strickland on the merits. Well, on the merits, if I may, I think it's a misstatement to say that she, the lawyer, it was a woman if I recall, did no investigation. I mean, she hired a private investigator who, among other things, investigated Sullivan. She talked to Sullivan's lawyer, she talked to Glisson about what Sullivan might say. And then, I mean, really the more remarkable thing, as I understand the record, is that Sullivan at his plea hearing, I think, swore that he had this leading, or no, that she was like a co-conspirator. He swore to basically the state's view of this conspiracy at his hearing. So if we have a case where the witness whom the lawyer is supposed to investigate has already basically testified under oath as to the relevant facts, I mean, what duty is there left to investigate? Well, I'd first say that merely finding out that he had a reason to take a plea deal, a self-interested reason to take the plea deal, which is what the state courts alluded to, is no investigation at all. I mean, everybody has a self-interested motive to take a plea deal. Well, it's a real problem either way, right? I mean, on the one hand, it's essentially his testimony already about the subject, which is contrary to what's useful to Glisson. On the other hand, if he were to testify to the contrary, he gets impeached with his sworn testimony or oath or whatever it was in the plea hearing, and at this point, I mean, is this guy's value so clear that it's ineffective assistance to just say, I'm going to go with the thug theory with this guy? Well, I think the question raises sort of two issues, and one is deficient performance and one is prejudice, and I don't want to conflate the two, just because... I am conflating them, I guess. They kind of come together. I mean, you know, the guy testified the other way, so anyway, they kind of come together. Your Honor, I hate to just throw quotes at you, but the... I mean, there are so many Sixth Circuit cases and elsewhere that, you know, Couch v. Booker says, to make a reasoned judgment about whether evidence is worth presenting, one must know what it says. So yes, you would have an impeachment issue, but... Is there a single case where the witness whom the lawyer did not investigate actually testified in some manner as to the subject matter of the testimony? Is there a single case in which the lawyer had that prior testimony and we said a failure to investigate further, forget the other stuff she did here, was ineffective? I don't know if the prior testimony... I don't know of such a case, but there are cases where the court has said that, although defense counsel's ultimate decision not to call a witness may be a reasonable trial strategy, it's not reasonable not to investigate it. And I just want to put some context on this. I mostly operate in federal court, where in the criminal context, you know, you don't get to depose witnesses before trial. The Jenks Act says, you know, you get their prior statements after they testify. Well, Tennessee has a Jenks Act, 26.2 of the code, and the idea that a trial counsel facing a murder charge, a life sentence, would not want two years before the case, you know, she's got a choice between, all right, I'll wait for during trial to learn what happened from the eyewitnesses that night, or two years beforehand, I can go talk to this guy who's literally a captive audience. I mean, he can't go anywhere. He's available. He testified that he would have happily talked to someone. He would have happily testified at trial. Any lawyer would jump at that. It's, I mean, even if you know that the guy has some impeachment issues, you can use that. I mean, you would base your entire trial strategy off of what you've got. I don't know about that. I mean, we're looking at this, you know, really with blinders on, and she made a judgment that he's already testified to the contrary. The guy's a total thug. I just want to separate my client from these guys, and just make her, make it seem like they just sort of, you know, dropped on her doorstep. And, I mean, that's, those are just two totally inconsistent lines, the one you're suggesting and the one she adopted. And under the circumstances, you know, there doesn't seem to be a case under the circumstances that makes clear it's ineffective. Your Honor, I believe that there are cases that make clear that it's ineffective to make a kind of call like the thug call. Because, I mean, the thug thing is a non sequitur. Because it does not attach your client to that person to go talk to him. The jury doesn't know that you drove to speak to the guy. And again, you're going to go talk to the person who would, the only eyewitness who is available at all to speak to. And it's just, it's astonishing that someone would not go speak to the person that can say, minute for minute, what happened that night? On the sufficiency, just real quick, I mean, is it kind of a coincidence that they end up at her doorstep that night? Or isn't that support for the idea that she was acting in concert and bringing those guys to the location of where the decedent would be? Your Honor, there, I think we can concede that she did give them the opportunity to speak to the person. She did give them the information that led them to her apartment. It is also clear, and I see my time's up, if I could just briefly answer. It's okay with the presiding judge. Thank you, Your Honor. He's a little touchy sometimes. Rarely. It's clear that the conversation in which she gives them that piece of information also contains the words, don't do it, and I don't want any part of this. And so, yes, she gives them that information. But that's not the standard under criminal responsibility. She needs to have the intent to facilitate that. Okay. And it's not a reasonable assumption from, I'm going home, I don't want any part of this, to say. Okay. I understand that. Thank you. Thank you, Your Honor. Thank you. May it please the Court, Michael Stahl for the respondent. Your Honor, the petitioner's ineffective assistance of counsel claim must have deferential application here by this court. The first estate court applied the correct governing legal rules, Strickland v. It cited this failure to investigate thing, right? I mean, it invoked it sort of in some boilerplate at the front end. Well, it invoked it, but also in its analysis, the estate court specifically said that when a counsel makes a decision, when her choices, his or her choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel, thereby recognizing that trial counsel's strategic decision in not calling David Sullivan was the result of an investigation that was complete and proper and Wait a minute. You lost me there. Where did they talk about the investigation and the analysis? Well, they, in the bottom part here, Your Honor, in the, when the analysis starts, I guess on page, I'm looking at the Westlaw citation on the fifth page. It says, upon our review, we conclude that the evidence does not preponderate against the findings of the post-conviction court. And then it goes through, counsel's strategy at trial was to separate the petitioner from her co-defendants. Counsel believed it would reflect negatively on the petitioner. Counsel testified that she did not call her subpoena, Sullivan, as a witness because she considered him a thug and did not want the jury to associate the petitioner with him. Counsel communicated her concerns to the petitioner. The petitioner trusted counsel's judgment. This court has previously stated that allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief. This court does not sit to second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel. The record shows that counsel, a veteran criminal defense attorney, was more than prepared for the petitioner's case. She engaged in a conscious decision not to call Sullivan. And therefore, we do not find that prejudice or deficiency occurred. Okay. Thank you. The chief complaint that the petitioner has in this case was that the trial counsel did not personally interview David Sullivan. But that is not necessary to conduct an appropriate and complete investigation under Strickland. Trial counsel, in this case, as the court noted, hired a private investigator to investigate David Sullivan. That investigator learned about several instances of violations under the UCMJ that David Sullivan had committed. He was subject to significant punishment under that. He pled guilty in this case to second-degree murder. Now, the petitioner presents to this court the idea that trial counsel needed to talk to David Sullivan to know what he was going to say. But trial counsel specifically testified in the petitioner's post-conviction hearing that she knew what he testified to. The plea colloquy had statements and references to that night that David Sullivan implicated and conspired with the petitioner to commit the offense. There were more facts that were stipulated, too. So not only did trial counsel know what David Sullivan would have to have said at trial and would have been impeached with, but then she went out of her way to talk to David Sullivan's attorney to learn more about it. It was at that point that she decided it was not worth the risk to put this witness on the stand, considering the trial strategy that had been made. That is why the state court denied relief, and that's why the district court denied relief, and that's why this court should deny relief. What's the downside to at least interviewing him? It's not a question of what the downside is, Your Honor. There's no downside. It's not that issue isn't before this court. The issue before the court under Strickland is... I'm just trying to understand why he didn't do it. I mean, he didn't do it because it's a waste of time, basically? Trial counsel testified that after her investigation, she spoke with the petitioner, and they decided that calling David Sullivan was not in their best interest. It's not about what trial counsel could have gone and done to the ends of the earth. It's not about what resources would have been required to continue to go. The question under Strickland is whether a complete investigation was done and whether an informed choice was made. In this case, it's clear that that occurred. So whether or not trial counsel would have testified to, well, it would have been difficult for me to do this, it would have cost money to do that, the issue is whether... I'm just trying to understand why he might not have done it. Well, she... I mean, opposing counsel says, look, a good lawyer would have done this because this is the eyewitness. If he turns out to be somebody who says things we don't want to hear at trial, we won't call him. He already said things they didn't want to hear at trial. That was the point. That's what counsel was saying, that I knew what he said at the plea colloquy. I had a copy of those stipulations. The state would have presented those statements to the jury, which would have completely eviscerated the strategy that we had agreed upon. So it's not a question of what he would have said. We know what he would have had to have said because he already said it under oath. So what trial counsel, the best trial counsel would have been able to do was talk to him about... Is what he said at the proffer, was that inconsistent with what he said? Absolutely. 100%, Your Honor. And that was the problem. And trial counsel heard that testimony at the post-conviction hearing and specifically testified during her portion of the post-conviction hearing that that was the reason that she didn't want to call him. Well, additionally, in the post-trial proceedings, Sullivan did testify. And at best, he gave lukewarm support to the petitioner. Well, he gave lukewarm support to the petitioner. And he also testified that he would have had to have conceded the stipulations that were made previously. So not only was... Well, my point is that we don't have to guess, actually, what he would have said. We actually hear his voice. And it wasn't very helpful, all things considered. It wasn't, Your Honor. It wasn't entirely helpful at the post... And it was certainly detrimental what was offered at the plea colloquy. So on both ends of the spectrum, you can see that not only was trial counsel's decisions strategically sound, but they were the best ones that could have been made for the petitioner. Essentially, what this comes down to is the petitioner complains that the petitioner received a life sentence, but she was the only one that went to trial. Everybody else was pled guilty. She was offered a plea deal and rejected it. This Court does not stand as a forum to re-evaluate a petitioner's decision to not accept a plea deal. Moving on to the petitioner's second issue, the sufficiency issue, the petitioner's chief complaint on that issue is twofold. And this Court noted, and the petitioner raised it again during oral argument, that the renunciation defense should have been better considered and approved by the jury. But that's not the issue before this Court. Under Jackson v. Virginia, and under habeas deferential review, the only thing that this Court looks at under state law is the essential elements of the crime. Other than that, this Court looks at Jackson v. Virginia to decide whether or not the evidence was sufficient to demonstrate that those elements were met. In this case, it's clear. Are you saying that if there was an available affirmative defense under state law, and the evidence in some fashion would allow or require the jury to find its elements met, that we just disregard that and look at whether the elements of the charged crime are met? What I'm talking about, Your Honor, in this case, is that the petitioner wants to argue that under state law, accomplished testimony is not sufficiently corroborated. Under state law, the renunciation defense was presented and improperly rejected because the evidence could have shown in renunciation defense. What's the answer to my question? I had a generic question. The answer to your question, Your Honor, is if the claim is presented, a sufficiency claim under Jackson v. Virginia, the only thing this Court is required to look at in terms of state law is the criminal elements of the offense. So we would disregard the evidence as to some affirmative defense? If that's the claim that's presented, yes, Your Honor. That's right. So what we have here is a situation where the petitioner wants to argue that under state law, the renunciation defense should have been properly accorded by the jury and that the accomplished testimony was... I'm sorry. Go ahead and finish your sentence. ...and that the accomplished testimony was insufficiently corroborated under state law. But that doesn't apply to the criminal elements that were presented. On that point, I mean, as I understand the argument made by Mr. Brandon, it's that there are really two different robberies that take place during this night. One, she's apparently on board for the first one. That's obviously not where the decedent is shot. But the second one, she's not on board and she tells them, I don't want any part of this or whatever. And so that actually goes to the element of intent, not to some post hoc renunciation that the evidence doesn't support a finding that she had an intent specifically for the second robbery that goes down. So what's your response to that? Your Honor, under the theory of criminal responsibility, a defendant need only associate him or herself with a venture act with the knowledge that the offense is to be committed and share in the criminal intent of the principal in the first degree. No particular act need be shown and the defendants need not have played a physical role in the crime. So the petitioner's argument here is that there was a sufficient renunciation of the second offense. But you're assuming that she had the intent to join in the second offense all along. Well, what I'm saying is that the evidence demonstrates that she acted with the knowledge that the robbery was going to occur and that she facilitated that robbery by providing specific... That's what I'm trying to elicit. What is, in your view, sort of the answer to Mr. Brandon's argument about whether she had this original intent, so to speak, for the second offense? Well, she knew that the second robbery was going to occur. A phone call was made by Mr. Henry and then David Sullivan to her to find out, to explain to her that the first robbery did not yield the results that they had expected. So they called her and said, what does he have on him? And she told them, I'm not sure, but we are going back to my apartment later this evening and he'll be there. And they said, well, we're going to rob him then. And she knew that an armed robbery had just occurred, so she knew that they were armed. And she said, okay, I will let you know when they're there. Meredith Runyon, who she's with, walks out of her apartment. The petitioner locks her door and the victim is shot. So she not only knew that the second robbery was going to occur, she provided specific information to ensure that that second robbery would occur. She confessed, which was on tape and played for the jury. Detective Danny Satterfield, who was with the National Police Department, testified as to the statements she made to him at several interviews that he took with her. And then all of that was corroborated by her co-defendant, Michael Henry, who testified that he spoke with her throughout the evening, including the time in between the first and second robbery. She knew that that second robbery was going to occur and that she kept providing them information about where the victim would be, when he would be there, and conspiring with them for them to lay in wait for when he arrived. That's the evidence that shows that she not only knew that the second robbery was going to occur, but that she aided and facilitated the execution of that second offense. So the petitioner's argument about renunciation defense or corroboration is not before this court. What this court needs to look at is under Jackson v. Virginia, whether the evidence is sufficient to support a conviction, if after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Is this phrase renunciation defense, those aren't the terms that Ms. Glisson is arguing or is it? In her brief, I thought I remembered her specifically mentioning that she renounced her participation in the second. The theory of it is that there are two separate robberies and there's insufficient intent for the second robbery. That's fine, Your Honor. Just now I thought I heard him say that we presented evidence of renunciation and therefore the second robbery doesn't show up. Maybe the word is used but I'm just trying to see what arguments we need to deal with. I'm not sure. Is there any difference between a renunciation defense and just saying these are two robberies, one of which she lacked the intent to commit? Whether or not... Because I'm not familiar with this defense if it's just being raised on oral argument. What are the terms of that? That's the thing, Your Honor. I haven't reviewed the state law requirements to demonstrate a sufficient renunciation defense. Let's put renunciation aside. Your argument with respect to these are two separate robberies and there's insufficient intent for the second one... Our argument is that there was sufficient evidence to demonstrate that the second robbery took place and that the conviction was valid. And that she was sufficiently connected with the second one. Yes, Your Honor. Okay. Thank you. If there are no further questions, we would ask this court to affirm the district court denial of the petitioner's confession. Briefly, Your Honors, just to clarify, we have not raised a renunciation defense. That was raised at trial. We haven't raised it in the briefs. We have pointed to the fact that I think her statement, don't do it, I don't want any part in this, goes directly to intent and it also goes to the reasonableness of the Tennessee Court of Criminal Appeals analysis on this question. Okay. Thank you. That helps. I appreciate that. Sure. But I think that both Mr. Stahl and I are guilty a little bit of maybe play acting, some dialogue that was not in the record in this case. And so I just want to be really clear. It is clear that Ms. Glisson said, don't do it, I don't want any part in this. That's about all that is clear from what the actual content of these phone calls were. There is evidence from which a jury could conclude that Ms. Glisson told them where she would be. There is evidence that she knew that their plan had changed. There is not evidence of her intent to join or facilitate that plan. And lest this seems sort of academic, you know, this court in Brown v. Palmer in 2006 said that you can't just, that reasonable speculation about intent is not enough. And in that case it cited to... Who said that she said don't do it? Michael Henry, who was allegedly on the phone with her. So he was the eyewitness. That's the state's witness saying that. The Brown v. Palmer opinion cites to an admittedly pre-EDPA case, but of Hobson v. Foltz, where it says, Hobson's actions following the shooting may have made him an accessory after the fact, but this cannot form the basis for a conviction as an aider and a better. So it matters very much that you have, you know, you can't just say, well, she once had an intent. And that intent just transfers to this second offense. But, I mean, did Mr. Stahl lay out, and doesn't the record have an awful lot of evidence that shows that she did arguably have the intent to facilitate or whatever the second robbery specifically? You would have to base it on a speculation from the fact that she told them where she was going. You would have to speculate that that was her intent to direct to them there. And you would have to speculate, make that speculation contrary to the only evidence about the content of that conversation, which was, don't do it, I don't want any part in this. And those sort of leaps of logic are the exact... She didn't say, I don't want any part in this. She did say that. She said, I want no part of it. Yes. I may be cleaning up the grammar a bit, but that is in the record. Michael Henry, the state's own witness, stated that. I seem out of time. Thank you, Your Honors. Thank you. Okay. The case will be submitted. Please call the next case.